THE NEWARK LIME AND CEMENT MANUFACTURING COMPANY *vs.* THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEWARK.

When an act of the legislature authorized commissioners, thereby appointed, to select a site for a bridge over the Passaic river, within certain limits in the city of Newark, and to erect, or cause to be erected, a bridge over the said river, and to lay out a road four rods wide from the courthouse in Newark to the place where the bridge was to be built, and the commissioners, having located the bridge, and provided for its erection, proceeded to lay out the road, and by the survey and return of which, recorded as required by the act, it appeared that the highway was laid out to "the west end of the bridge"—

*Held,* that inasmuch as the survey carries the highway to the river, wherever the river is found, there the highway extends. If the shore is ex

Newark Lime and Cement Co. *v.* Mayor and Council of Newark.

tended into the water by alluvial deposits, or is filled in by the proprietor of the soil, the public easement is, by operation of law, extended from its former terminus over the new made land to the water.

The owner of the soil, even when his title is unquestioned, cannot, by filling in, and thus extending his land towards the water, obstruct the public right of way to the river.

The highway being required to be sixty-six feet wide, and the bridge being only required to be thirty-two feet wide, if in progress of time it had been found the interest of the bridge proprietors to widen the bridge to sixty-six feet, it is not perceived why they may not lawfully have done so, and required the full width of the highway for that purpose. The public could not justly have contracted the highway to the prejudice of the proprietors, nor, on the other hand, can the proprietors, by leaving a part of the highway unappropriated, impair the rights of the public, much less can they despoil the public of their rights by claiming title hostile to those under whom they claim.

The proprietors of the bridge may be deemed to have the right to the enjoyment, for the purposes of the trust committed to them, of the whole terminus of the highway upon the river. This seems necessarily involved in the right of constructing a bridge for the accommodation of the highway across the river to any width they may deem proper over thirty-two feet; but this possession was not independent of or hostile to the public right, and no right adverse to the public could be acquired under it.

If, under such circumstances, the bridge proprietors, or those claiming under them, set up title adverse to the public easement, and especially if they invoke the aid of a court of equity to protect them in the enjoyment of such pretended right, it becomes them to show conclusively the existence of the right, and how they acquired it.

*J. P. Bradley*, for complainants.

*T. Runyon*, for defendants.

THE CHANCELLOR. By a resolution of the common council of the city of Newark, approved on the fourth of October, 1858, the street commissioner was directed to notify the owner of any building, fence, or other encroachment or obstruction, on Bridge street below Ogden street, to remove the same; and in case the owner neglected or refused to remove the same within thirty days from the time of receiving such notice, the street commissioner was directed to cause the same to be removed, as provided by an ordinance of the

city relating to streets and highways.   In obedience to this order, the street commissioner served a notice upon the complainants to remove a certain building, fence, and encroachment, in front of their property, on the south side of Bridge street.   With this notice the complainants refused to comply, and thereupon the street commissioner threatened to take down and remove the building, and open Bridge street over a strip of land and wharf claimed by the complainants as their property.   To restrain this action by the street commissioner the bill in this cause was filed, and an injunction was issued pursuant to the prayer of the bill.

The case made by the bill is briefly this :

By an act of the legislature, passed on the twenty-fourth of November, 1790, entitled " an act for building bridges over the rivers Passaic and Hackensack, and for other purposes therein mentioned," commissioners were appointed with powers, among other things, to select a site for a bridge over the Passaic river, within certain limits designated in the act, and to erect, or cause to be erected, a bridge over the said river.   They were also empowered to lay out a road four rods wide from the court-house, in the then town of Newark, to the place where the bridge was to be built over the Passaic river, thence to the place where the bridge was to be built over the Hackensack river, and thence to Powleshook.   The act required a return of the road, thus laid out by the commissioners, to be made and recorded.   The commissioners, having located the bridge over the Passaic at the place in the city of Newark now known as the foot of Bridge street, and having also located the bridge over the Hackensack, in pursuance of powers conferred on them by the act, on the nineteenth day of February, 1793, by an indenture of that date, leased the bridges, so to be erected and built, to certain individuals, and contracted with said lessees for the building and keeping in repair of said bridges for the term of ninety-seven years.   The lessees, prior to the year 1794, proceeded to erect the bridge over the Passaic river, at the place designated, thirty-two feet in width, and also the

bridge over the Hackensack, and the said lessees and their successors have ever since kept and maintained the said bridges. After the erection of the bridge over the Passaic river, the commissioners proceeded to lay out the road authorized by the act, and filed a survey, and return thereof, on the fifteenth of January, 1794, which was duly recorded. By a supplemental act, passed on the tenth of November, 1795, the commissioners were authorized, in consequence of a mistake in the return of the said road, to correct and alter the same, so as to take in and comprehend the road originally intended by them to be laid out, and to have the returns thus altered recorded. In pursuance of the power thus conferred, the commissioners rectified the mistake, and laid out anew the said road, by a return bearing date on the first of July, 1796. The road, as laid by the commissioners, extended, northwardly along Broad street, in the city of Newark, to the place where Bridge street now is, and thence eastwardly to the first pier of the bridge over the Passaic river, forming the street now called Bridge street. At the time the road was surveyed and located, the first pier of the bridge was about eighty feet westerly of the present westerly abutment of the bridge; the west side of the river at that point having been docked out and filled in, and the complainants, in consequence thereof, having filled in the space originally covered by the west end of the bridge from the original west pier to the present west abutment, and have, since such filling in, kept the said space in repair as a causeway of approach to the said bridge and as part thereof.

The bill further alleges that, soon after the first building of the bridge over the river Passaic, the proprietors thereof procured title to a strip of land along the south side of the bridge at its western terminus, and extending eastwardly to low water mark in the Passaic river; that about the year 1800, they erected a house there for the accommodation of their keeper, and that, by a deed, dated on the tenth of August, 1842, the proprietors of the bridges conveyed the said strip of land, with the building thereon, to the complainants, and the com-

plainants have since had the seizin and possession thereof. At the time of the purchase by the complainants, the west abutment of the bridge was twenty-five feet easterly of the east end of the building, and the proprietors of the bridge, two or three years before the filing of the complainants' bill, removed the abutment twenty feet further east, to its present location. Complainants have filled in and docked out the strip conveyed to them, and have built a wall to prevent the causeway, which is ten feet higher than the lot, from caving in and falling upon the lot. The lot is now eighty feet in length, fourteen feet wide at the west end, and ten feet at the east end, and that the wharf is an important part of complainants' wharf.

It is not denied that Bridge street, like all the other streets in Newark, is under the control of the city council, and that, in directing obstructions and encroachments upon the street to be removed, they were acting within the legitimate scope of their powers. The only question is, whether the land where the building is erected, and to which the complainants claim title, is or is not a part of Bridge street. The city claims that the street extends to the bridge, as now constructed, its full width of four rods, or sixty-six feet. Within those limits the complainants' building and the land to which they claim title is situate. The complainants contend that the street extends only to the point where the westerly abutment of the bridge formerly stood, and that the space between that point and the present westerly abutment of the bridge is a causeway of approach having a lawful width of only thirty-two feet, the original width of the bridge itself. It appears, by the defendants' answer, that the highway, as laid out and returned by the commissioners, did not stop at the pier of the bridge, but was extended across the river. The description in the survey, after arriving at a point in Broad street, is as follows : " thence north, seventy-nine degrees and fifty minutes east, twelve chains and eighty-six links, to the first pier of the said bridge building over Passaic river ; thence across and over the said river north, eighty-

four degrees and fifteen minutes east, seven chains." The description in the amended return is as follows: " thence north, eighty degrees east, twelve chains and seventy-seven links, to the west end of the bridge; thence south, eighty-four degrees east, eight chains and fifty-three links, to the east end of said bridge." The description in both returns is substantially the same, varying slightly in course and distance. The monument called for at the end of the first course is not the abutment of the bridge nor the causeway leading to the bridge, but in the one return it is the pier, or face of the abutment upon the river, which supports the bridge; in the amended return the call is for the bridge itself, and thence the highway extends across the river to the east end of the bridge.

It is objected that a highway cannot be laid across a navigable river. It may be admitted that there is no subsisting highway for horses or carriages in the channel of the river. But it is enough, for all the purposes of this cause, that the survey carries the highway to the river, and wherever the river is found there the highway extends. If the shore is extended into the water by alluvial deposits, or is filled in by the proprietor of the soil, the public easement is, by operation of law, extended from its former terminus over the new made land to the water. The owner of the soil, in whom the unquestioned title is, cannot, by filling in, and thus extending his land toward the water, obstruct the public right of way to the river. *The People* v. *Lambier,* 5 *Denio* 9.

The principle was recognized and adopted by the Court of Appeals of this state in the case of *The Morris Canal* v. *The Inhabitants of Jersey City,* 1 *Beasley* 547.

This would be the result if the unquestioned title to the soil was in the complainants. But it is quite clear, from the evidence, that the complainants have no title whatever to the freehold. They claim title under a deed from the bridge proprietors, dated on the tenth of August, 1842, but not acknowledged until the nineteenth of November, 1844, about fourteen years before the filing of their bill. The bill

alleges, that soon after the first building of the bridge, the bridge proprietors, under whom the complainants claim, acquired title to the land in question ; but how, when, or from whom the title was acquired, or what the title was, they do not state. The allegation of the bill is, that soon after the first building of the bridge over the Passaic river, the proprietors thereof procured the title to a small strip of land, along the south side of the bridge at its westerly terminus, about fourteen feet in width, and extending in length from the westerly terminus of the said bridge, along the south side thereof easterly, to low water mark in the Passaic river, upon which strip of land the said proprietors afterward, in or about the year 1800, erected a house for the accommodation of their gate-keeper, which house is still standing. It is clearly shown, by the evidence, that the house was erected, as the bill alleges, by the bridge proprietors for their gate-keeper ; that it stands now in its original location ; that its west end stood on the same bulkhead with the west pier of the bridge, and that the house extended eastward over the waters of the river, and that the tide flowed under it. Not only does the bill fail to state the origin of the complainants' title, but there is no evidence whatever, other than mere occupancy, in support of the claim of title. The evidence is all adverse to the claim. It is shown that the tide flowed under the house years after it was erected; that vessels drawing four to six feet of water lay at the bulkhead immediately above and below the bridge. How did the bridge proprietors acquire title to the soil of a navigable river below high water mark? It was clearly in the public when the house was erected. How was the public right divested? The riparian proprietor might have acquired title by filling in and reclaiming land from the river. But no title to the shore is shown or pretended to have been in the bridge proprietors. On the contrary, the complainants' own evidence shows that, when the highway now called Bridge street was laid out, James Davis owned the land over which it was laid from Broad street to the river and

on each side of the present bridge. They deduce no title from Davis or his heirs. The officers and stockholders of the bridge company have been examined. They state that they supposed they had title, but not one of them intimates that they ever acquired a title by grant, purchase, or conveyance to a foot of the shore, or that they ever paid one dollar consideration for it. The whole evidence renders it clear that they never had such title.

It is equally clear that the proprietors acquired no title to their land, either from the lease made to them, by the commissioners, on the nineteenth of February, 1793, or from their act of incorporation, of the seventh of March, 1797. The effect of the contract was simply a grant, by the state to the proprietors, of the right of constructing the bridges, and the franchise of taking tolls thereon for the term of ninety-seven years, and a covenant, on the part of the proprietors, to construct and keep in repair the bridges during the term, and at the expiration thereof to surrender the property into the hands of the state. *Bridge Proprietors* v. *The State,* 1 *Zab.* 384.

All that the bridge proprietors can rightfully claim under the contract, as against the public, would be the right to the unobstructed use of so much of the public highway as may be necessary for the full and unlimited enjoyment of their franchise. They were required, by the terms of their contract with the commissioners, to build the bridge not less than thirty-two feet in width; and it may be that, in contracting the span of their bridge, and lengthening the causeway to it, they are not bound to build their causeway more than the required width of the bridge, to wit, thirty-two feet, and that they were justified in encroaching upon the highway by the erection of their toll-house without the limits of the thirty-two feet. But they clearly acquire no right by which they can defeat the public easement.

The proprietors were invested with an important public trust, the continuance of a public highway across the river by means of a bridge, which they agreed to erect and

maintain, and upon which they were vested with the franchise of taking tolls. The highway to the bridge was sixty-six feet wide. It was so required to be under the act by virtue of which the bridge was erected, and under which the proprietors acquired their rights. They were required to build the bridge only thirty-two feet. If in the progress of time, it had been found the interest of the proprietors to widen the bridge to sixty-six feet, the full width of the highway, it is not perceived why they might not lawfully have done so, and required the full width of the highway for that purpose. The public could not justly have contracted the highway to the prejudice of the proprietors; nor, on the other hand, can the proprietors, by leaving a part of the highway unappropriated, impair the rights of the public, much less can they despoil the public of their rights by claiming title hostile to those under whom they claim. The proprietors may be deemed, by virtue of their lease, to have gone into possession, and to have the right to the enjoyment, for the purpose of the trust committed to them, of the whole terminus of the highway upon the river. They had a right to occupy and use the whole of it for the purposes of their incorporation. This possession seems necessarily involved in their right of constructing a bridge, for the accommodation of the highway across the river, to any width they may deem proper over thirty-two feet. But this possession was not independent of or hostile to the public right, and no right adverse to the public could be acquired under it. If under such circumstances the bridge proprietors, or those claiming under them, set up title adverse to the public easement, and especially if they call upon the aid of a court of equity to protect them in the enjoyment of such pretended right, it becomes them to show conclusively the existence of the right, and how they acquired it.

The fact, that the bridge proprietors have contracted the water span of their bridge by supplying what was originally the west end of the bridge within the limits of the city of Newark with a solid embankment of earth, may give rise to

questions between the city and the proprietors touching the obligation to repair, or the control of the city over the causeway thus formed; but these questions, should they arise, are proper for the consideration of a court of law, and are in no way involved in the present controversy.

I am clear that the complainants are not entitled to relief, and that their bill must be dismissed.